870 So.2d 208 (2004)
BEVERLY HEALTHCARE KISSIMMEE, Appellant,
v.
AGENCY FOR HEALTH CARE ADMINISTRATION, Appellee.
No. 5D02-1874.
District Court of Appeal of Florida, Fifth District.
March 19, 2004.
*209 Donna Holshouser Stinson and Maura M. Bolivar of Broad and Cassel, Tallahassee, Attorneys for Appellant.
Karen L. Goldsmith of Goldsmith, Grout and Lewis, P.A., Winter Park, Amicus Curiae.
Garnett W. Chisenhall, Tallahassee, Attorney for Appellee.

ON MOTION FOR REHEARING
PETERSON, J.
We grant the motion for rehearing filed by the Agency for Health Care Administration, withdraw our previous opinion and substitute the following in its place.
Beverly Healthcare Kissimmee (Beverly), a nursing home operator, appeals a final order of the Agency for Health Care Administration (Agency) that downgrades Beverly's state license rating from "standard" to "conditional." The Agency's final order rejected many of the Administrative Law Judge's (ALJ) findings of fact and its conclusion that Beverly was entitled to a standard rating. We reverse.
*210 The basic difference that exists between the ALJ's conclusion and that of the Agency is the classification of three deficiencies found by the Agency's surveyors during a routine inspection and the follow-up inspection of Beverly's nursing home conducted pursuant to section 400.23, Florida Statutes (2001). The surveyors classified the deficiencies as Class III, while the ALJ classified them as Class IV. We need not relate the details of the first two deficiencies because they were found during the initial inspection and were corrected before the time of the follow-up visit. The third deficiency was found during the follow-up visit. In fact, only the third deficiency is actually relevant as it was the sole deficiency noted in the follow-up inspection, and it is because of this "uncorrected Class III deficiency" that the facility lost its standard license rating. See § 400.23(7)(b), Fla. Stat. (2001) (allowing a facility time to correct a Class III deficiency before facing a license downgrade, but providing that if, on the follow-up visit, a new Class III violation exists, strict liability attaches).
The asserted Class III deficiency discovered during the follow-up visit at Beverly involved a resident not wearing multi-podus boots required by the resident's care plan, as prescribed by a medical provider. The boots are used to prevent and promote the healing of pressure sores, a condition from which the resident was suffering when he entered the facility. The absence of the boots was noticed on two occasions by the surveyor; once when the resident was lying on his bed and once when the resident was sitting in a wheelchair with street shoes on his feet and his feet resting on the footrests of the chair. To explain this deviation from the care plan, Beverly's witness testified that the resident's bed had a pressure mattress and, therefor, the multi-podus boots were not required. Neither was the wearing of street shoes while in the wheelchair a risk to the man because dressings had been placed on his heels and no real weight was on his feet. In fact, under Beverly's care, one sore had healed completely and the other was much smaller.
Beverly challenges the Agency's conclusion that this single departure from the resident's care plan on a follow-up inspection, regardless of the circumstances and in the absence of potential for harm, constitutes a Class III deficiency warranting a conditional license. Beverly submits that this standard of perfection is unattainable and unreasonable and moreover is a departure from the law and precedent. Specifically, Beverly attacks the following conclusion of law in the Agency's final order:
The Agency specifically rejects the legal conclusion in this paragraph [paragraph 27 of the recommended order] and elsewhere in the Recommended Order that the Agency is required to show that the facility's failure to follow the plan of care presents potential for harm to the resident. The charge of failing to follow the plan of care requires nothing more than a showing by the Agency that the facility failed to follow the plan of care, and unless a facility disputes the underlying fact alleged as the basis for the Agency's charging document, the facility's request for a formal hearing before the Division of Administrative Hearing should be denied. Section 120.569(2)(c), Florida Statutes.
Beverly labels this conclusion as "arrogant" and contends that the Agency cannot impose a conditional license without a hearing and without having to show at least a potential for harm to a resident. Beverly argues that the failure to follow a care plan on one occasion, in the absence of evidence that the care plan was not followed consistently, will not support imposition of a conditional license. Rather *211 than perfect compliance with a care plan, Beverly asserts that substantial compliance is the applicable standard.
We agree with Beverly that section 400.23 implicitly requires only "substantial compliance." Although the statutory provision does not directly state it in that manner, section 400.23(7)(b) allows a conditional license to be given when the facility is not in substantial compliance with the statutory criteria or the rules adopted by the Agency. Inferentially then, substantial compliance is the standard by which the facility should be judged.[1] We note that application of this standard is not novel. See Agency for Health Care Admin. v. Beverly Health-Care Lake Mary, 2002 WL 569452 (DOAH 2002), adopted, 24 F.A.L.R. 2888 (Fla. Agency for Health Care Admin.2002); Tampa Health Care Ctr. v. Agency for Health Care Admin., 2001 WL 963678 (DOAH 2001), adopted in part, 24 F.A.L.R. 2552 (Fla. Agency for Health Care Admin.2002); Cypress Manor v. Agency for Health Care Admin., 1999 WL 1483668 (DOAH 1999), adopted in part, 21 F.A.L.R. 2768 (Fla. Agency for Health Care Admin.1999). A facility may have deficient practices but may still be found to be in substantial compliance; the determining factor is the level of actual or potential harm to a resident's health or safety.
If the Agency is bent on requiring perfect compliance with every detail of every care plan, it appears to us that every inspection of every nursing home will result in Class III deficiencies. We also venture the thought that some details of a care plan, ordered hastily or without full investigation of a patient's medical history, could also lead to the detriment of a resident. A nursing home employee should not be intimidated into ignoring common sense for fear of incurring the wrath of the Agency. The standard imposed by the Agencythat any deviation from a care plan is cause for a Class III deficiency ignores state standards calling for substantial, not perfect, compliance and further ignores the existence of Class IV as a valid classification for deficiencies meeting its criteria, which brings us to Beverly's second argument.
In addition to its contention that an incorrect standard was applied, Beverly also argues that the isolated deficiency found in the follow-up survey was, as the ALJ found, more properly labeled a Class IV deficiency, not a Class III deficiency. Had a Class IV rank been assigned, just as the ALJ recommended, Beverly would have received the standard license rating. Section 400.23(8)(c) defines a Class III deficiency, with which Beverly was charged, as
a deficiency that the agency determines will result in no more than minimal physical, mental, or psychosocial discomfort to the resident or has the potential to compromise the resident's ability to maintain or reach his or her highest practical physical, mental, or psychosocial well-being, as defined by an accurate and comprehensive resident assessment, plan of care, and provision of services.
*212 § 400.23(8)(c), Fla. Stat. (2001). Section 400.23(8)(d), on the other hand, defines a Class IV deficiency as "a deficiency that the agency determines has the potential for causing no more than a minor negative impact on the resident. If the class IV deficiency is isolated, no plan of correction is required."[2] § 400.23(8)(d), Fla. Stat. (2001).
The Agency rejected the ALJ's conclusion that the events were isolated[3] and had the potential for causing no more than a minor negative impact on the resident. The Agency found the potential for harm is irrelevant and all that mattered was that there was evidence that a case plan was not followed. We disagree with the Agency's analysis.
The entire statutory scheme is based on a classification of deficiencies, with the deficiencies being classified according to the level of harm that might or did result from the deficiency. See § 400.23(8), Fla. Stat. (2001) (requiring the agency to establish rules classifying deficiencies according to the nature and the scope of the deficiency; breaking scope down into "isolated," "patterned," or "widespread"; further requiring that the deficiency then be classified into one of four classes dependent upon the level of harm or impairment the deficiency caused or was likely to cause).[4] Accordingly, the Agency has the burden to prove harm or the potential for harm upon a resident in order to substantiate its classification of any deficiency. In this case, the Agency failed in its burden by taking the hard-line position that any deviation from a care plan constitutes a deficiency. The Agency offered no evidence of actual or potential harm from the failure of the resident to wear pressure boots and gave no consideration to the fact that alternate methods of preventing pressure sores were in place. The ALJ found that the level of harm was a Class IV deficiency, a finding that is supported by the facts.
Because an agency cannot reject a finding of fact made by an administrative law judge unless there is no competent substantial evidence to support the finding, on appellate review of the agency order, the issue for the appellate court is whether the record contains evidence sufficient to support the original finding of fact by the administrative law judge. § 120.57(1)(I), Fla. Stat. (2003). As summarized by this court,
where there is competent, substantial evidence to support the referee's findings of fact, the Commission may not reweigh the evidence and substitute its findings of fact for those of the referee. Moreover, the Commission may neither modify a referee's findings of fact to reach a different legal conclusion, see Berry v. Scotty's, Inc., 711 So.2d 575 (Fla. 2d DCA 1998), nor rely on facts that were not established at the hearing *213 conducted by the referee. See Eulo v. Florida Unemployment Appeal Comm'n, 724 So.2d 636 (Fla. 2d DCA 1999).
Anderson v. Unemployment Appeals Comm'n, 822 So.2d 563, 567 (Fla. 5th DCA 2002) (footnotes omitted); see also Gross v. Department of Health, 819 So.2d 997, 1002 (Fla. 5th DCA 2002) (observing requirement that where competent substantial evidence supports findings of fact, the final order cannot reject those findings). Review of the record in the instant case indicates that competent substantial evidence supports the ALJ's finding that the deficiency should have been classified as a Class IV deficiency. Thus, the Agency erred in rejecting that finding.
For the reasons discussed above, we reverse the Agency's determination that Beverly's state license rating should be downgraded and instruct the Agency to reinstate the standard rating based upon the ALJ's findings and conclusion.
REVERSED.
PALMER and TORPY, JJ., concur.
NOTES
[1] It is clear that under the federal code, "substantial compliance" is indeed the standard. See 42 C.F.R. § 488.301 (defining "substantial compliance" as used in the rules governing the surveys of nursing facilities as meaning "a level of compliance with the requirements of participation such that any identified deficiencies pose no greater risk to resident health or safety than the potential for causing minimal harm"; also defining "noncompliance" as meaning "any deficiency that causes a facility to not be in substantial compliance."). However, there is some concern that the state standards may be higher than the federal standards and thus reliance on federal statutory definitions may be suspect.
[2] We note that before the follow-up inspection was conducted, section 400.23 was amended to add Class IV designations for the first time and that classification was available to the surveyors when they performed the follow-up inspection. The surveyors did not explain why the deficiency was rated as a Class III rather than Class IV. It could be because the distinction between the classes is difficult to understand or it could be that the amendment had not yet been brought to their attention. The ALJ disagreed with the assessment that all of the deficiencies warranted a Class III label and that disagreement was explained in the ALJ's findings.
[3] This conclusion of the ALJ is supported by the testimony of one of the surveyors who admitted that the deficiency was isolated.
[4] Clearly, for a deficiency to be classified, the surveyor must make a determination of the possible consequence that the deficiency might have.